## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
THE PROTECT DEMOCRACY PROJECT,          )
                                        )
                            *Plaintiff,* )
                                        )     Case No. 1:17-CV-00792 (RDM)
v.                                      )
                                        )
UNITED STATES DEPARTMENT OF             )
HEALTH AND HUMAN SERVICES,              )
                                        )
                           *Defendant.* )
                                        )
                                        )
_____)

## THE PROTECT DEMOCRACY PROJECT'S CROSS MOTION
## FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff The Protect Democracy Project respectfully moves for summary judgment as to Defendant's failure to comply with the Freedom of Information Act and improper withholding of information under the claimed applicability of Exemption 5.  There are no genuine issues of material fact with respect to these issues.  The accompanying Memorandum sets forth more fully the reasons that support Plaintiff's motion.

Date:  New York, NY                    Respectfully submitted,
       January 23, 2018                */s/ David J. Sandler*

                                       David J. Sandler (Bar No. 988900)
                                       David H. Bernstein (Bar No. NY0228)
                                       DEBEVOISE & PLIMPTON LLP
                                       919 Third Avenue
                                       New York, NY  10022
                                       212-909-6000
                                       dsandler@debevoise.com
                                       dhbernstein@debevoise.com

Benjamin L. Berwick (Bar No. MA0004)
THE PROTECT DEMOCRACY PROJECT
10 Ware Street
Cambridge, MA  02138
Ben.Berwick@protectdemocracy.org

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2018, I electronically filed a copy of the foregoing Cross Motion for Summary Judgment.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Date:  New York, NY
       January 23, 2018

Respectfully submitted,
*/s/ David J. Sandler*

David J. Sandler (Bar No. 988900)
David H. Bernstein (Bar No. NY0228)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY  10022
212-909-6000
dsandler@debevoise.com
dhbernstein@debevoise.com

Benjamin L. Berwick (Bar No. MA0004)
THE PROTECT DEMOCRACY PROJECT
10 Ware Street
Cambridge, MA  02138
Ben.Berwick@protectdemocracy.org

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

                                                    )
THE PROTECT DEMOCRACY PROJECT,                      )
                                                    )
                                        *Plaintiff*, )
                                                    )    Case No. 1:17-CV-00792 (RDM)
v.                                                  )
                                                    )
UNITED STATES DEPARTMENT OF                         )
HEALTH AND HUMAN SERVICES,                          )
                                                    )
                                       *Defendant*. )
_____)


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE PROTECT DEMOCRACY PROJECT'S CROSS MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.    Cancellation of Obamacare Advertising.................................................................. 2

    II.    FOIA Request and Litigation Background ................................................................ 3

    III.    The Government's Search ......................................................................................... 6

LEGAL STANDARDS ....................................................................................................... 8

ARGUMENT ...................................................................................................................... 9

    I.    The Government's Search Was Inadequate for at Least Four Reasons ...................... 9

        A.    HHS's hastily performed searches led to the omission of relevant custodians ................................................................................................ 9

        B.    CMS similarly omitted necessary custodians ................................................. 11

        C.    Both HHS and CMS were deficient in searching for enrollment data and related discussions ........................................................................... 12

        D.    Obviously missing categories of documents showcase the inadequacy of the Government's searches ........................................................ 13

    II.    The Government Redacted Materials Not Properly Subject to FOIA Exemption 5................................................................................................... 15

        A.    Deliberative process privilege ....................................................................... 15

        B.    Attorney-client privilege.............................................................................. 18

        C.    At a minimum, the Court should conduct *in camera* review of the redactions.............................................................................................. 19

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**CASES**

*Assassination Archives & Res. Ctr. v. CIA*, 334 F.3d 55 (D.C. Cir. 2003) ...................................... 9

*Campbell v. U.S. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998) .................................................. 19

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ...................... 15, 18

*DeBrew v. Atwood*, 792 F.3d 118 (D.C. Cir. 2015) ............................................................. 10, 11

*Friends of Blackwater v. U.S. Dep't of the Interior*, 391 F. Supp. 2d 115 (D.D.C. 2005)........... 12

*Hinckley v. United States*, 140 F.3d 277 (D.C. Cir. 1998) ............................................................ 17

*Judicial Watch, Inc. v. FDA*, 449 F.3d 141 (D.C. Cir. 2006) ....................................................... 18

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ............................................................ 11, 13, 16

*Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57 (D.C. Cir. 1990) ...................................... 9, 10, 12

*Outlaw v. U.S. Dep't of the Army*, 815 F. Supp. 505 (D.D.C. 1993) ............................................. 8

*Paisley v. CIA*, 712 F.2d 686 (D.C. Cir. 1983), *vacated on other grounds*, 724 F.2d 201
    (D.C. Cir. 1984)........................................................................................................................ 16

*Reliant Energy Power Generation v. FERC*, 520 F. Supp. 2d 194 (D.D.C. 2007) ........................ 8

*Senate of the Commonwealth of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574 (D.C. Cir.
    1987)........................................................................................................................................ 17

*Truitt v. Dep't of State*, 897 F.2d 540 (D.C. Cir. 1990) ................................................................ 8

*United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121 (D.D.C. 2012) ........................... 19

*Urban Air Initiative, Inc. v. EPA*
    No. 15-1333, 2017 WL 4284542 (D.D.C. Sept. 25, 2017)........................................... 9, 11, 12

*Valencia-Lucena v. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999)...................................... 8, 12, 13

**STATUTES AND RULES**

5 U.S.C. § 552 ....................................................................................................... 8, 15, 19, 20

Fed. R. Civ. P. 56(a) ...................................................................................................................... 8

## **INTRODUCTION**

One of the first acts of the Trump administration was to cancel advertisements promoting enrollment in health insurance exchanges set up under the Affordable Care Act (a.k.a. Obamacare) during the final weeks of the 2016-17 open enrollment period, including advertisements that had already been placed and paid in full.  The decision to cancel this advertising was one of multiple steps the Trump administration has reportedly taken for the express purpose of undermining—rather than faithfully executing—a law that was duly enacted by Congress.

Plaintiff the Protect Democracy Project ("PDP")—out of concern that the Trump administration is seizing for itself power vested in Congress, and in an effort to understand and educate the public about the nature of this apparently unlawful action and its impact—sought through a Freedom of Information Act ("FOIA") request to the Department of Health and Human Services ("HHS" or "the Department") documents related to the decision to cancel these advertisements as well as documents showing the impact this decision had on enrollment in health insurance plans during the critical final weeks of the enrollment period.

The Government sat on PDP's request for months, missing its statutory deadline to respond.  It was not until PDP sued HHS that the Department made any effort to even search for responsive documents.  Then, its efforts to search for responsive documents were rushed and facially inadequate.  For instance, the HHS FOIA Office sat on the request for six months and then, days before a litigation deadline, asked one official to search his own emails while on official travel.  Unsurprisingly, those emails identify other HHS officials who were involved in these matters whose emails were not searched.  The Centers for Medicare and Medicaid Services ("CMS") FOIA Office recycled a search from another request that lacked relevant search terms

and there appear to be custodians likely to have responsive documents whose records were not searched.  For the small number of documents that HHS did identify, HHS improperly redacted factual material, non-deliberative information, and other content that it had no basis to withhold.

The Government's clear violations of FOIA warrant a grant of summary judgment for PDP, and the Government's motion for summary judgment should be denied.

## BACKGROUND

### I.      Cancellation of Obamacare Advertising

Six days after President Trump's inauguration, on January 26, 2017, *POLITICO* reported that "[t]he Trump administration has pulled the plug on all Obamacare outreach and advertising in the crucial final days of the 2017 enrollment season, according to sources at Health and Human Services and on Capitol Hill."  (Sandler Decl., Ex. 1 (Paul Demko, *Trump White House abruptly halts Obamacare ads*, POLITICO, https://www.politico.com/story/2017/01/trump-white-house-obamacare-ads-234245 (Jan. 26, 2017)).)  "Even ads that had already been placed and paid for have been pulled," the article stated.  (*Id.*)  The Government's action came in the context of President Trump's first executive order, which "allow[ed] federal officials to start unwinding parts of the [Affordable Care Act]."  (*Id.*)  The article quoted "[a]n HHS spokesman" as describing the action as a cost-saving measure.  (*Id.*)

The next day, on January 27, 2017, *POLITICO* published a follow-up article reporting that the previous day's news had sparked such an outcry that "[t]he Trump administration has reversed plans to scrap all Obamacare outreach," and that instead some, but not all, of the advertising would be canceled.  (Sandler Decl., Ex. 2 (Rachana Pradhan & Paul Demko, *Reversing course, Trump administration will continue Obamacare outreach*, POLITICO,

https://www.politico.com/story/2017/01/obamacare-message-healthcare-gov-trump-234278 (Jan.

27, 2017)).)  The article quoted an unnamed "HHS spokesman" as saying, "[W]e pulled back the

most expensive and least efficient part of this massive ad campaign."  (*Id.*)

      PDP believes, based on public reporting, that canceling the advertisements was part of a

concerted strategy by the Trump administration to undermine the duly enacted health care law.

(*See* Sandler Decl., Ex. 3 (Haeyoun Park, *We're Tracking the Ways Trump is Scaling Back*

*Obamacare.  Here Are 12.*, N.Y. Times,

https://www.nytimes.com/interactive/2017/10/12/us/trump-undermine-obamacare.html (Oct. 12,

2017) (listing HHS's decision to "slash spending on advertising and promotion for enrollment"

as one of 12 efforts to undermine the statute)).)  The ad cancellation contributed to this broader

effort by driving down enrollment, particularly of the "younger and healthier customers who are

crucial to making insurance markets work" and who tend to sign up in the last few days of the

open enrollment period.  (Sandler Decl., Ex. 1.)

      These efforts apparently worked:  enrollments in health insurance during the last two

weeks of open enrollment were down approximately 300,000 from the previous year.  (Sandler

Decl., Ex. 4 (Michelle Hackman, *About 9.2 Million Americans Sign Up for Health Plans on*

*Federal Exchange*, Wall St. J. (Feb. 3, 2017), https://www.wsj.com/articles/about-9-2-million-

americans-sign-up-for-health-plans-on-federal-exchange-1486161398?mg=prod/accounts-wsj

("About 400,000 consumers signed up during the final two weeks of enrollment this year,

compared with nearly 700,000 in the same period last year.")).)

## II.    FOIA Request and Litigation Background

      On February 15, 2017, PDP submitted a FOIA request to HHS and CMS requesting

records associated with the cancellation of the Obamacare advertising campaign.  (Sandler Decl.,

Ex. 5 ("FOIA Request").)  The request designated six specific categories of documents that PDP

was seeking, all related to the Government's decision to discontinue advertising for the website

http://www.healthcare.gov and enrollment in healthcare coverage and the impact that potentially

had on health insurance enrollment:

> (1) All formal and informal documents, including but not limited to email communications and memoranda, between and among employees of the Department of Health and Human Services ("HHS") Office of the Secretary and/or Office of Public Affairs and/or the Centers for Medicare and Medicaid Services ("CMS") Office of the Administrator and/or Office of Communications concerning the decision to discontinue advertising for healthcare.gov and/or enrollment in healthcare coverage.  The timeframe for this request is January 20, 2017 through February 1, 2017.

> (2) All formal and informal documents, including but not limited to email communications and memoranda, between the HHS and/or CMS transition teams and the White House concerning the decision to discontinue advertising for healthcare.gov and/or enrollment in healthcare coverage.  The timeframe for this request is January 20, 2017 through February 1, 2017.

> (3) All formal and informal documents, including but not limited to email communications and memoranda, between and among employees of the HHS Office of the Secretary and/or HHS Office of Public Affairs and/or CMS Office of the Administrator and/or CMS Office of Communications concerning the effect of the Trump Administration's decision to discontinue the advertising detailed above on enrollment numbers.  The timeframe for this request is January 20, 2017 through February 1, 2017.

> (4) All formal and informal documents, including but not limited to email communications and memoranda, between and among employees of the HHS Office of Public Affairs and/or CMS Offices of Communications concerning the article published by *Politico* on January 26, 2017 entitled, "Trump White House Abruptly Halts Obamacare Ads."

> (5) All formal and informal documents, including but not limited to email communications and memoranda, between and among employees in the HHS Office of the Secretary and/or HHS Office of Public Affairs and/or CMS Office of the Administrator and/or CMS Office of Communications concerning the number of people who enrolled in healthcare coverage after President Trump took office, which CMS made public on February 3, 2017.  CMS reported that approximately 200,000 Americans signed up for coverage in the final two weeks of the open enrollment period.  The time-frame for this request is January 20, 2017 through February 6, 2017.

4

(6) All formal and informal documents, including but not limited to email communications and memoranda, between HHS and/or CMS employees and the White House concerning the number of people who enrolled in healthcare coverage after President Trump took office, which CMS made public on February 3, 2017.  CMS reported that approximately 200,000 Americans signed up for coverage in the final two weeks of the open enrollment period.  The time-frame for this request is January 20, 2017 through February 6, 2017.

(*Id.* at *1-2.)

When neither office responded to PDP's request by the statutory deadline, PDP initiated this action to compel disclosure of the requested records.  (Compl. at 5, April 28, 2017, Dkt. No. 1.)

Two months later, at the June 26, 2017 status conference, HHS had still not completed preliminary searches.  The Court ordered the parties to report back by July 10 with information on the status of Defendant's search for records.  (Electronic Minute Order, June 26, 2016.)

In a July 10 joint status report, PDP and the Government stated that they had agreed to a process and schedule by which the HHS would "process 1,150 pages already identified and up to 350 pages of any additional documents that may be identified through Defendant's ongoing work" and produce responsive, non-exempt documents by September 8, 2017.  (Joint Status Report at 1-2, June 11, 2017, Dkt. No. 15.)

On September 8, 2017, the HHS FOIA Office issued a response to PDP's request, consisting of 33 pages of heavily redacted email records.  (Marquis Decl. at *39-71, Dec. 15, 2017, Dkt. No. 18-2.)[1]  The same day, the CMS FOIA Office issued a separate response with 237 pages of also heavily redacted email records.  (Gilmore Decl. at *29-265, Dec. 15, 2017, Dkt. No. 18-3.)

---

[1]     Pin citations are to ECF pagination for the Marquis and Gilmore Declarations and their exhibits.

PDP raised concerns about the adequacy of the production and the redactions, and the parties agreed to a briefing schedule whereby the Government would file its motion for summary judgment "on or before December 15, 2017."  (Joint Status Report at 1, Oct. 13, 2017, Dkt. No. 17.)

On the eve of that deadline, just before the Government was forced to justify its withholdings in its summary judgment brief, HHS and CMS revisited their productions and issued minor revisions.  (Marquis Decl. at *73-75 (stating that HHS was removing redactions on six pages of previously-released documents); Gilmore Decl. at *267-69 (stating that CMS was removing redactions on five pages of previously-released documents, and also releasing four additional pages).)

The Government filed its motion for summary judgment on December 15, 2017.  (Gov't Mot. for Summ. J., Dec. 15, 2017, Dkt. No. 18.)

## III.    The Government's Search

HHS's FOIA Office received PDP's request on February 27, 2017.  (Marquis Decl. at *25.)  On the same day, the request was forwarded to (i) the HHS Assistant Secretary for Administration ("ASA"), and (ii) CMS.  (*Id.*)  No action was taken for months.

Shortly after PDP filed this lawsuit on April 28, 2017, the HHS FOIA Office re-sent the request to CMS.  (*Id.*)  CMS FOIA Office Director Hugh Gilmore then asked the CMS Office of the Administrator and the CMS Office of Communications to conduct searches.  Gilmore asked both offices to search for the terms "discontinue," "advertising," "healthcare.gov," and "enrollment."  (Gilmore Decl. ¶¶ 10, 11.)  Instead of searching for those terms, the Office of the Administrator responded to Gilmore on May 8, 2017, by sending documents that were deemed responsive to a purportedly similar FOIA request.  (*Id.* ¶ 11.)  For that request, Office of the

Administrator staff searched the Outlook mailbox of Principal Deputy Administrator Patrick

Conway—who had been Acting Administrator for CMS during the relevant period of time—for

the terms "pulling," "advertising," and "healthcare.gov" (but not "enrollment").  (*Id.*)  The CMS

Office of the Administrator stated that it believed Conway's files "were likely to contain any

records [from that office] responsive to [PDP's] request."  (*Id.*)  Separately, the CMS Office of

Communications identified four individuals—unnamed and unidentified in Gilmore's

declaration—who were "determined . . . to have familiarity with the subject matter" and "most

likely to have records responsive to the request."  (*Id.* ¶ 10.)  Those four custodians searched

their respective Outlook mailboxes for the four requested terms.  (*Id.*)

Another month went by, and then another, before finally, on August 30, HHS FOIA

Office Director Michael S. Marquis requested that Mark Weber, HHS's Acting Assistant

Secretary for Public Affairs ("ASPA"), search for responsive records.  (Marquis Decl. ¶ 14.)

That request came six months after the initial request, over two months after the status

conference, and just days before a September 8 litigation deadline to begin producing responsive,

non-exempt materials.  (*See id.* at *31 (Email from Marquis to Weber, August 30, 2016 ("We're

dealing with a litigation deadline")).)  HHS's procrastination put the Department in a bind:  when

Marquis contacted ASPA Weber, Weber was away from the office on official travel.  But faced

with the litigation deadline, the search was needed immediately.  ASPA Weber performed his

"search" remotely by "reviewing emails exchanged with the officials 'who were involved in

addressing this issue at that time'" and forwarding certain emails to Marquis.  (Gov't Br. in

Supp. of Mot. for Summ. J. at 9 (quoting Marquis Decl. ¶ 14), Dec. 15, 2017, Dkt. No. 18-1.)

The ASA never responded to Marquis and apparently never performed a search.  (*See*

Marquis Decl. at *25 (noting the request was forwarded to ASA on February 27, 2017); Gov't

Br. at 9 n.1 (stating no action was ever taken, "apparently on account of administrative oversight").)  The Government also never searched the records of any officials in the Immediate Office of the Secretary, despite the Office of the Secretary being named in multiple subparts of PDP's in its FOIA Request.  (FOIA Request at 1-2.)

## LEGAL STANDARDS

Summary judgment is appropriate when the record as a whole demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  FOIA cases are typically resolved on cross-motions for summary judgment. *Reliant Energy Power Generation v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007).

When the Government moves for summary judgment on the adequacy of its search, the motion may only be granted if the agency demonstrates "beyond material doubt" that its search was "reasonably calculated to uncover *all* relevant documents." *Valencia-Lucena v. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (emphasis added) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).  An agency "'cannot limit its search' to only one or more places if there are additional sources 'that are likely to turn up the information requested.'" *Id.* at 326 (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).  If "the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt*, 897 F.2d at 542.   If the Government fails to show that its withholding of documents has been proper, summary judgment should be granted to the FOIA plaintiff. *Outlaw v. U.S. Dep't of the Army*, 815 F. Supp. 505, 506-07 (D.D.C. 1993).

In evaluating a challenge to an agency's withholding or redaction of materials as exempt from FOIA, the Court must review the matter *de novo*, 5 U.S.C. § 552(a)(4)(B), and the

Government "bears the burden of establishing the applicability of the claimed exemption,"

*Assassination Archives & Res. Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003).


## ARGUMENT

PDP is entitled to summary judgment because (I) the Government did not conduct an

adequate search and (II) the Government's exemption claims are overbroad and inappropriate.

Alternatively, these two issues raise genuine issues of material fact that at the least prevent the

entry of summary judgment in the Government's favor.

## I.     The Government's Search Was Inadequate for at Least Four Reasons

### A.     *HHS's hastily performed searches led to the omission of relevant custodians*

FOIA requires the Government to search of all record-systems and custodians that are

"likely" to uncover relevant documents.  *Oglesby*, 920 F.2d at 68 ("the agency cannot limit its

search to only one record system if there are others that are likely to turn up the information

requested"); *see also Urban Air Initiative, Inc. v. EPA*, No. 15-1333, 2017 WL 4284542, at *10

(D.D.C. Sept. 25, 2017) (citing *Oglesby*, 920 F.2d at 68) (stating the EPA must search all

custodians "likely to produce responsive documents").

HHS, facing a litigation deadline to produce responsive documents and not having even

begun to search, searched only the emails of one official:  Assistant Secretary for Public Affairs

Mark Weber.  (Marquis Decl. ¶ 14.)  His produced emails, however, demonstrate that several

other HHS officials were also involved in the events in question and were likely to possess

relevant documents.  Many of the emails that HHS produced involve, among others, Randy Pate,

John Brooks, Ryan Murphy, and Tim Clark, all of whom work in the Immediate Office of the

Secretary (for which PDP specifically requested communications), and none of whose records

were searched.  (*See, e.g.*, Marquis Decl. at *80-81, *84, *86, *89, *91, *99 (emails to Pate, Brooks, Murphy, and Clark).)  These emails also show that officials exchanged emails on which Weber was not copied.  For example, one of Weber's emails contains forwarded text from a previous exchange between Pate, Clark, Brooks, and CMS's Acting Communications Director Mary Wallace but not Weber.  (*Id.* at *80-81.)  Having reviewed these emails, HHS could see that Pate, Clark, and Brooks were communicating about relevant events without Weber on the chain, thus it is unreasonable for HHS to have never searched their emails for documents responsive to PDP's request.  Unsurprisingly, no explanation has been given as to why these individuals' records were not searched, an omission that is fatal.  *See Oglesby* 920 F.2d at 68 (requiring that the Government's affidavit "aver[] that all files likely to contain responsive records . . . were searched").

HHS's failure to search Clark's records is particularly striking given that he was HHS's White House Liaison (Marquis Decl. at *84) and PDP expressly requested communications with the White House (FOIA Request at 1-2).  Out of everyone at HHS, Clark's emails are perhaps the most likely to contain White House communications, and it is not improbable he was having such email communications without copying other HHS staff.  The documents produced thus far suggest that Clark received guidance from the White House regarding the ad cancellation which did not go directly to other staff.  (*See, e.g.*, Gilmore Decl. at *53-54.)

Similarly, Weber's search is inadequately described in the Marquis Declaration, rendering it impossible for the Court to "determine if the search was adequate."  *DeBrew v. Atwood*, 792 F.3d 118, 122 (D.C. Cir. 2015) (quoting *Oglesby*, 920 F.2d at 68).  For summary judgment to be appropriate, the Government's affidavit must be "reasonably detailed" and "set forth the search terms and type of search performed."  *Oglesby*, 920 F.2d at 68.  Marquis's

description of Weber's search tells us Weber performed his search while away from the office on official travel, and that he "reviewed" his emails for communications with individuals he recalled being involved and "emailed responsive records" to Marquis, but it gives no information about whether Weber searched with search terms or by manually browsing, and if he used search terms what terms those were. (Marquis Decl. ¶ 14.) That lack of detail precludes summary judgment in the Government's favor. *See DeBrew*, 792 F.3d at 122, 135 (denying summary judgment because the Government's did not adequately describe how the agency searched); *Morley v. CIA*, 508 F.3d 1108, 1129 (D.C. Cir. 2007) (same).

The Government similarly admits that even though HHS determined that the Office of the ASA likely possessed responsive records, that office did not perform a search due to an "administrative oversight." (Gov't Br. at 9 n.1.) While the Government posits that the ASPA would likely have any responsive records not also maintained by CMS (*id.* (citing Marquis Decl. ¶ 14)), at no point does Marquis state that he revisited his determination regarding the ASA. Where an agency had determined that a custodian or record system is likely to contain responsive records, a conclusion that another individual or record system likely also has any responsive records is not sufficient to excuse the agency from its obligation to search the former. *See Urban Air Initiative*, 2017 WL 4284542, at *10 (denying summary judgment to the EPA because its statement that the chosen custodians were selected because they were "reasonably likely to be in possession of [] responsive records" did not "aver that no other custodians were likely to possess responsive documents").

## B. *CMS similarly omitted necessary custodians*

CMS's search also omitted likely responsive record holders. CMS's Office of Communications only searched the four individuals who were "*most* likely" to have responsive

records.  (Gilmore Decl. ¶ 10 (emphasis added).)  Searching only those *most* likely is not the same as searching everyone likely to have responsive records, and the former is not sufficient under FOIA.  *See Valencia-Lucena*, 180 F.3d at 325 (searches must be reasonably calculated to uncover *all* relevant records); *Oglesby*, 920 F.2d at 68 ("It is not clear from State's affidavit that the Central Records system is the *only* possible place that responsive records are likely to be located."); *Urban Air Initiative*, 2017 WL 4284542, at *10 (denying summary judgment to the EPA because its affidavit did not make clear that "no other custodians were likely to possess responsive documents"); *Friends of Blackwater v. U.S. Dep't of the Interior*, 391 F. Supp. 2d 115, 121 (D.D.C. 2005) (the Interior Department must conduct a search in every office that is "likely to have" responsive documents).  CMS also does not name or in any way identify the Office of Communications custodians it searched, making it impossible for PDP to identify whether there are specific custodians whose records should have been searched and were not.

### C.      Both HHS and CMS were deficient in searching for enrollment data and related discussions

PDP's FOIA Request asked for communications on two subject matters:  (i) HHS's cancellation of ACA advertising and (ii) its impact on enrollment data.  (FOIA Request at 1-2.) Neither HHS nor CMS adequately searched for documents related to the second issue.

At HHS headquarters, the Government's declaration states that ASPA Weber "reviewed the emails of those officials who were involved in addressing *this issue*."  (Marquis ¶ 14 (emphasis added).)  What issue?  Enrollment data, ad cancellation, or both?  It is impossible from the Government's declaration to know, and that alone precludes a finding that the search was sufficient.  *Oglesby*, 920 F.2d at 68.  It is easy enough to infer that he did not did not search for discussions regarding enrollment data, however, given that the documents from Weber that HHS produced all pertain to ad cancellation and not enrollment data.

At CMS, the Government chose not to perform a new search for records in the CMS Office of the Administrator, relying instead on a previous search of Acting Administrator Conway's records for the terms "pulling," "advertising," and "healthcare.gov."  (Gilmore Decl. ¶ 11.)  That search is missing the term "enrollment" or anything that would reasonably return documents related to enrollment statistics.  CMS used that search term for the four Office of Communications employees, and it had asked the Office of the Administrator to use that term as well, but it did not.  (*Id.* ¶¶ 10-11.)  The Government offers no explanation for the CMS Office of the Administrator's failure to conduct enrollment-related searches.

### D.   *Obviously missing categories of documents showcase the inadequacy of the Government's searches*

When the Government produces documents in response to a FOIA request and a requested category of documents in existence are missing, or even if there is a factual dispute as to whether those missing documents exist, summary judgment may not be awarded to the Government unless the Government has "explained the records' absence."  *Morley*, 508 F.3d at 1121.  FOIA also requires agencies to identify any obvious missing documents and "follow through on obvious leads to discover requested documents."  *Valencia-Lucena*, 180 F.3d at 325.  Here, at least three categories of missing documents demonstrate that the Government's search was inadequate.

First, the Government's search did not produce documents that would reasonably be expected regarding the cancellation of advertising.  The Government did not produce *any* documents memorializing the initial decision or direction to cancel advertising.[2]  It similarly produced zero communications with vendors cancelling advertisements.  Also, while HHS told

---

[2]   HHS did identify one email discussing the revisited decision on January 26 to leave certain already paid for advertisements in place.  (Marquis Decl. at *106.)

*POLITICO* that it had "pulled back the most expensive and least efficient part of this massive ad campaign, which was set to run over the weekend" (Sandler Decl., Ex. 2), HHS did not produce any communications discussing the cancelled advertisements' costs and efficiencies.

Second, the Government's search uncovered no responsive emails to or from any White House email accounts ("who.eop.gov").  PDP specifically asked for any communications with the White House on the subject matter at issue.  (FOIA Request at 1-2.)  As mentioned above, the documents produced to date show that HHS officials specifically sought and received the advice of White House Liaison Tim Clark (whose email was never searched), presumably because he was in fact liaising with the White House.  (Gilmore Decl. at *39-40, *53-54.)  This is sufficient to infer that written communications with the White House are reasonably likely to exist (and would have been found had HHS searched Clark's emails).  The void of emails with the White House is highly probative of the inadequacy of HHS's search.

Third, the Government did not produce any documents containing actual enrollment data or discussions of those numbers.  As mentioned above, PDP requested documents discussing "the number of people who enrolled in healthcare coverage after President Trump took office." (FOIA Request at 2.)  It is a certainty that CMS officials communicated about such data—it was publicly released on February 3.  (*See* Sandler Decl., Ex. 6, Press Release, Ctrs. for Medicare and Medicaid Servs., Biweekly Enrollment Snapshot (Feb. 3, 2017), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2017-Fact-Sheet-items/2017-02-03.html).  Yet the documents produced by CMS and HHS contain only a template of where such data should go.  (Gilmore Decl. at *168-72.)  There are no emails containing actual data, not to mention discussions of what the Department should say publicly about the

14

steep decline in enrollment after Trump took office.  The absence of such documents strongly suggests that the Government's search was inadequate.

## II.     The Government Redacted Materials Not Properly Subject to FOIA Exemption 5

The Government withheld or redacted numerous documents under FOIA Exemption 5, which permits the withholding of documents "which would not be available by law to a private party in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption 5 permits the Government to withhold or redact documents that would be protected under either (i) the executive deliberative process privilege, or (ii) the attorney-client privilege.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).  The Government's redactions and withholdings go beyond what is permitted under Exemption 5, however.

### A.     *Deliberative process privilege*

For a document to be lawfully withheld pursuant to the deliberative process privilege, the document or its contents must be both (i) "predecisional," in that "it was generated before the adoption of an agency policy," and (ii) "deliberative," in that it "reflects the give-and-take of the consultative process."  *Id.* at 866.  Thus, while the deliberative process privilege may extend to many types of documents—"recommendations, draft documents, proposals, suggestions, and other subjective documents"—the key is whether the information withheld is both predecisional and deliberative.  One or the other will not do.

It is difficult for any non-government litigant to combat the asymmetry of information inherently involved in a debate over the Government's claimed FOIA exemptions.  But here, even on the face of the Government's redactions, there are strong indications that the Government has asserted privilege far too broadly:

(i)      <u>Inconsistent redactions</u>:  The Government's tendency for over-redaction is apparent from multiple instances in which CMS redacted text that was produced in unredacted form by HHS.  For example, HHS produced a January 26, 2017 email from Randy Pate detailing HHS's revised decision as to which advertisements would be cancelled and which would go forward:  "The free email blasts, social media etc are approved to go forward.  The ad buys that cannot be refunded at this point are ok to go forward."  (Marquis Decl. at *85.)[3]  It makes sense that this content was produced:  it is decisional, not pre-decisional, and it lacks the give-and-take that is the hallmark of deliberative material.  Yet when CMS produced this same email, CMS redacted this text.  (Gilmore Decl. at *49.)  In another email produced by both CMS and HHS, CMS redacted an obviously non-deliberative back-and-forth about scheduling:  "I can get you a decent amount of detail in the next few hours," "Next few hours on the budget works," and "Let me know any questions"; those same statements went unredacted in HHS's production.  (*Compare* Gilmore Decl. at *105-07, *108, *with* Marquis Decl. at *76, *94.)  These examples raise serious doubts as to what else HHS and CMS have improperly redacted or withheld.

(ii)      Facts, not deliberation:  "Factual material that does not reveal the deliberative process is not protected by [the deliberative-process privilege]."  *Morley*, 508 F.3d at 1127 (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983), *vacated on other grounds*, 724 F.2d 201 (D.C. Cir. 1984)).  Moreover, if the "information given in the affidavit and *Vaughn* index provide the court with no way of knowing" whether redacted or withheld information is factual or not, then summary judgment may not be awarded to the Government.  *Id.* (remanding to the district court with an order that the Government "must supply at least 'the minimal information necessary to make a determination'").  Here, at least one of the Government's redactions on its

---

[3]      HHS initially redacted this language, but subsequently re-produced it unredacted.

face appears to pertain only to discussions of fact, with no exposure of deliberative processes.

CMS produced a January 25, 2017 email to Mary Wallace and others, with the subject line

reading "Financial Implications of Pulling Advertising," and the entirety of the text stating,

"Mary - here are the numbers.  I am available on My work phone with questions."  (Gilmore

Decl. at *68-69.)  The rest of the email—which spans one-and-a-half pages and presumably

contains these "numbers"—is redacted.  (*Id.*)  CMS's *Vaughn* index reports only the obvious,

that this redaction "incorporat[es] a January 25, 2017 email between CMS and OS officials,"

with a conclusory statement that the email contains "pre-decisional, deliberative

recommendations concerning the discontinuation of certain advertisements for healthcare.gov."

(*Id.* at *13.)  But if the redacted "numbers" are the costs for different ad campaigns previously

contracted by HHS, those figures are facts that must be disclosed under FOIA.  Even if CMS

were deliberating over which of those ads to cancel—something not apparent from the redactions

or *Vaughn* description—the agency should still just redact the deliberative text and produce the

rest of the communication.

     (iii)    <u>Insufficient *Vaughn* descriptions</u>:  FOIA places a burden on the Government to

"establish what deliberative process is involved, and the role played by the documents in issue in

the course of that process."  *Hinckley v. United States*, 140 F.3d 277, 284 (D.C. Cir. 1998)

(quoting *Senate of the Commonwealth of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574,

585-86 (D.C. Cir. 1987)).  Here, the Government repeatedly claims that entire blocks of text—

sometimes the entire email, including the header data showing the date, time, sender and

recipients—are covered by Exemption 5.  (*See, e.g.*, Marquis Decl. at *77, *79, *96-97, *99,

*101-02; Gilmore Decl. at *217, *218, *254, *260.)  The *Vaughn* indexes' descriptions of these

block redactions shed almost no light on their content.  HHS's *Vaughn* index, for example,

repeats for all but one of the deliberative-process-privilege entries the same identical boilerplate language:  the "redacted material consists of pre-decisional, deliberative recommendations concerning the discontinuation of certain advertisements for healthcare.gov."  (Marquis Decl. at *110-13.)  These sorts of boilerplate *Vaughn* descriptions are not sufficient and cannot support summary judgment.  *See, e.g.*, *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006) (vacating summary judgment granted to the Government as to Exemption 5 because a *Vaughn* index is insufficient if it "tells the court little about the deliberative nature of the information contained in the document in question").

(iv)    Post-deliberation:  While the deliberative process privilege protects internal deliberations prior to a final decision, it does not shield the final determination from public view. The inconsistent redactions, discussed above, show that CMS redacted post-deliberative material.  In another instance, CMS heavily redacted a document, describing it in its *Vaughn* index as containing deliberative "draft talking points."  (Gilmore Dec. at *13 (referencing *id.* at *74).)  But a review of the produced document indicates the redacted material is post-decisional content.  The unredacted text preceding the block redaction states:  "Here is what we are providing on the record from HHS spokesman."  Not only does that content appear to be post-decisional because HHS had already decided what it was going to say to the press on the record, but that content also necessarily became post-decisional because it was "used by the agency in its dealings with the public."  *Coastal States*, 617 F.2d at 866.

**B.    Attorney-client privilege**

The Government may also have over-applied the attorney-client privilege.  The attorney-client privilege only applies where communications with counsel are "made primarily for legal

advice." *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 129 (D.D.C. 2012) (quoting *Neuder v. Battelle Pac. Nw. Nat'l Lab*, 194 F.R.D. 289, 295 (D.D.C. 2000)).

Here, the Government has asserted attorney-client privilege over sections of emails written by non-attorneys to other non-attorneys. (*See, e.g.*, Marquis Decl. at \*99.) HHS's *Vaughn* index simply reports that the redaction "discloses communications between OGC and CMS concerning the possibility of discontinuing certain advertisements for healthcare.gov." (*Id.* at \*112). Merely communicating about the ad cancellation is not enough to invoke the privilege, however; the communication must have been primarily for the purpose of legal advice. HHS has not provided enough information to evaluate that question. (*See also id.* at \*110-12 (noting communications with attorneys but not indicating whether those communications were primarily for the purpose of legal advice, with reference to redactions at *id.* at \*77, \*79, and \*102).) The Government therefore has not met its burden of proving its entitlement to Exemption 5 based on the attorney-client privilege.

### C.      At a minimum, the Court should conduct in camera review of the redactions

The Court has broad discretion to "examine the contents of [redacted] records in camera to determine whether such records or any part thereof shall be withheld under any of the [FOIA] exemptions." 5 U.S.C. § 552(a)(4)(B). *In camera* review is appropriate if the Government's submitted declarations are ambiguous as to whether information has been improperly withheld. *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998) (noting *in camera* review of the disputed records was appropriate where "the district court did not find the declarations adequate to justify withholding a file").

Here, as described above, a number of the Government's redactions cannot be justified even on their face. But these facially apparent errors may be just the tip of the iceberg. When

they are considered together, they raise questions as to whether the other redactions are appropriate, and more importantly whether the entire redaction process was performed in an acceptable manner.  Although these errors on their own demonstrate a FOIA violation and entitle PDP to summary judgment, given these issues, the Court should require *in camera* review of the withheld information to evaluate the reasonableness of all of the Government's redactions.

## **CONCLUSION**

The Government violated FOIA, 5 U.S.C. § 552(b), by failing to conduct an adequate search and improperly applying redactions.  Those violations entitle PDP to summary judgment. The Government has also failed to justify how it searched or the basis for its redactions, each of which independently precludes summary judgment for the Government.

With respect to the inadequate search, the Court should order the Government to (i) conduct a supplemental search that is reasonably calculated to uncover *all* relevant records, and (ii) produce responsive, non-exempt documents, detailed search affidavits, and *Vaughn* indexes describing any withholdings or redactions.

With respect to the improper and insufficiently described redactions, the Court should order the Government to (i) remove improper redactions and produce corrected versions of its existing productions and (ii) produce an updated and more detailed *Vaughn* index.  In the alternative—or after the Government has reproduced the documents and an updated *Vaughn* index—the Court should review the Government's redactions *in camera* and order released any inappropriately redacted text.

At a minimum, the Government has not met its burden for summary judgment.  The

Court should deny the Government's motion for summary judgment and order the Government

to issue more detailed search affidavits and a more detailed *Vaughn* index.


Date:   New York, NY                                Respectfully submitted,
        January 23, 2018                            */s/ David J. Sandler*

                                                    David J. Sandler (Bar No. 988900)
                                                    David H. Bernstein (Bar No. NY0228)
                                                    DEBEVOISE & PLIMPTON LLP
                                                    919 Third Avenue
                                                    New York, NY  10022
                                                    212-909-6000
                                                    dsandler@debevoise.com
                                                    dhbernstein@debevoise.com

                                                    Benjamin L. Berwick (Bar No. MA0004)
                                                    THE PROTECT DEMOCRACY PROJECT
                                                    10 Ware Street
                                                    Cambridge, MA  02138
                                                    Ben.Berwick@protectdemocracy.org

                                                    *Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

THE PROTECT DEMOCRACY PROJECT,   )
                                 )
                                 )
                       *Plaintiff,*   )
                                 )   Case No. 1:17-CV-00792 (RDM)
v.                               )
                                 )
UNITED STATES DEPARTMENT OF      )
HEALTH AND HUMAN SERVICES,       )
                                 )
                       *Defendant.*   )
———————————————————————)

**THE PROTECT DEMOCRACY PROJECT'S STATEMENT OF UNDISPUTED**
**MATERIAL FACTS AND RESPONSE TO THE GOVERNMENT'S STATEMENT OF**
**FACTS**

Pursuant to Local Civil Rule 7(h) and Judge Randolph D. Moss's November 20, 2017

Standing Order in Civil Cases, Plaintiff The Protect Democracy Project ("PDP") hereby submits the

following:  (I) a statement of material facts as to which there is no genuine issue, in support of

PDP's Cross Motion for Summary Judgment, and (II) a statement in response to the Government's

Statement of Facts (Dec. 15, 2017, *Dkt.* No. 18).

**I.      Protect Democracy's Statement of Undisputed Statements of Fact in Support of its**
**Cross Motion for Summary Judgment**

1.      On or around January 26, 2017, HHS cancelled advertising and outreach efforts to

promote enrollment in health insurance through the Affordable Care Act health insurance

exchanges.  (Sandler Decl., Ex. 1 (Paul Demko, *Trump White House abruptly halts Obamacare ads*,

POLITICO, https://www.politico.com/story/2017/01/trump-white-house-obamacare-ads-234245

(Jan. 26, 2017)).)

2.      On or around January 27, 2017, in response to press inquiries and public outcry, HHS

revisited the decision, but still cancelled much of the advertising and outreach campaign.  (*Id.*, Ex. 2

1

(Rachana Pradhan & Paul Demko, *Reversing course, Trump administration will continue Obamacare outreach*, POLITICO, https://www.politico.com/story/2017/01/obamacare-message-healthcare-gov-trump-234278 (Jan. 27, 2017)).)

3.      PDP submitted a Freedom of Information request to Defendant U.S. Department of Health and Human Services ("HHS," or "the Government") on February 15, 2017.  (*Id.*, Ex. 5, at *1.)

4.      PDP's request seeks:

(1) All formal and informal documents, including but not limited to email communications and memoranda, between and among employees of the Department of Health and Human Services ("HHS") Office of the Secretary and/or Office of Public Affairs and/or the Centers for Medicare and Medicaid Services ("CMS") Office of the Administrator and/or Office of Communications concerning the decision to discontinue advertising for healthcare.gov and/or enrollment in healthcare coverage.  The timeframe for this request is January 20, 2017 through February 1, 2017.

(2) All formal and informal documents, including but not limited to email communications and memoranda, between the HHS and/or CMS transition teams and the White House concerning the decision to discontinue advertising for healthcare.gov and/or enrollment in healthcare coverage.  The timeframe for this request is January 20, 2017 through February 1, 2017.

(3) All formal and informal documents, including but not limited to email communications and memoranda, between and among employees of the HHS Office of the Secretary and/or HHS Office of Public Affairs and/or CMS Office of the Administrator and/or CMS Office of Communications concerning the effect of the Trump Administration's decision to discontinue the advertising detailed above on enrollment numbers.  The timeframe for this request is January 20, 2017 through February 1, 2017.

(4) All formal and informal documents, including but not limited to email communications and memoranda, between and among employees of the HHS Office of Public Affairs and/or CMS Offices of Communications concerning the article published by *Politico* on January 26, 2017 entitled, "Trump White House Abruptly Halts Obamacare Ads."

(5) All formal and informal documents, including but not limited to email communications and memoranda, between and among employees in the HHS Office of the Secretary and/or HHS Office of Public Affairs and/or CMS Office of the Administrator and/or CMS Office of Communications concerning the number of people who enrolled in healthcare coverage after President Trump took office, which CMS made public on February 3, 2017.  CMS reported that approximately 200,000

Americans signed up for coverage in the final two weeks of the open enrollment period.  The time-frame for this request is January 20, 2017 through February 6, 2017.

(6) All formal and informal documents, including but not limited to email communications and memoranda, between HHS and/or CMS employees and the White House concerning the number of people who enrolled in healthcare coverage after President Trump took office, which CMS made public on February 3, 2017.  CMS reported that approximately 200,000 Americans signed up for coverage in the final two weeks of the open enrollment period.  The time-frame for this request is January 20, 2017 through February 6, 2017.

(*Id.* at *1-2.)

5.      HHS received PDP's request on February 27, 2017.  (Marquis Decl. at *16, Dec. 18, 2017, Dkt. No. 18.)

6.      HHS and CMS did not determine whether to comply with PDP's request and notify PDP of such determination and the reasons therefor within 20 days of receipt, *i.e.*, by March 19, 2017.  (*See id.* ¶ 15; Gilmore Decl. ¶ 12.)

7.      PDP filed this Action on April 28, 2017.  (Compl. at 5, April 28, 2017, Dkt. No. 1.)

8.      After the litigation was filed, on or about May 8, 2017, CMS had four employees of the CMS Office of Communications that CMS deemed "most likely" to have responsive records search their own email for records potentially responsive to PDP's request using the terms "discontinue," "advertising," "healthcare.gov," and "enrollment."  (Gilmore Decl. ¶ 10.)  CMS has not identified these employees by name or position.  (*See id.* ¶ 10.)

9.      CMS's Office of the Administrator re-used search results that were obtained via a search of Acting CMS Administrator Patrick Conway's email in response to a different FOIA request for which it had used the terms "pulling," "advertising," and "healthcare.gov."  (*Id.* ¶ 11.)  CMS did not use the search term "enrollment" when searching the records of Conway or others in the CMS Office of the Administrator.  (*Id.*)

10.     An HHS official forwarded PDP's request to HHS's Office of the Assistant Secretary for Administration ("ASA") for the purpose of performing a responsive search.  (*See* Marquis Decl.

3

at *22.)  ASA's records were not searched due to an "administrative oversight."  (Gov't Br. at 9 n.1.)

11.     On August 30, 2017—nine days before HHS's September 8 deadline have processed and produced responsive, non-exempt records and more than six months after the date of PDP's request—an HHS FOIA officer contacted the Assistant Secretary for Public Affairs ("ASPA") Mark Weber for the first time regarding PDP's request.  (Marquis Decl. ¶ 14.)  Weber was on official travel, but searched his own emails for communications with other officials he recalled were involved in "this issue."  (*Id*.)

12.     HHS did not search the records of any other individuals in the Office of Public Affairs, the Office of the Secretary, or HHS more broadly.  (*See id.* ("I limited my search . . . to . . . Mark Weber.").)

13.     The Government ultimately produced 274 pages of responsive records.  (*Id.* at *76-108; Gilmore Decl. at *29-265, *270-78.)  141 of those 274 pages contain redactions.  (Marquis Decl. at *35, *74; Gilmore Decl. at *26, 268.)  Another 13 pages of responsive records were withheld in their entirety.  (Gilmore Decl. at *26.)  HHS and CMS each prepared *Vaughn* indexes describing their redactions and withholding.  (Marquis Decl. at *110-13; Gilmore Decl. at *11-23.)

## II.     Protect Democracy's Statement in Response to the Government's Statement of Facts

| Government's Statement of Fact | PDP's Response |
|---|---|
| 1.  Plaintiff Protect Democracy Project, Inc., submitted a Freedom of Information Act (FOIA) request to HHS dated February 15, 2017. | Undisputed. |
| 2.  In the FOIA request, Plaintiff sought the following records: [quoting the FOIA request]. | Undisputed. |
| 3.  Plaintiff filed its Complaint on April 28, 2017, before HHS had completed its search for records responsive to the FOIA request or released any records in response to the request. | Undisputed. |
| 4.  HHS conducted a search for responsive | Disputed as characterized.  HHS searched the |

| | |
|---|---|
| records located at the Office of the Secretary (OS) within the Office of the Assistant Secretary for Public Affairs (ASPA). HHS also conducted a search for responsive records located at the Centers for Medicare and Medicaid Services (CMS) located within the Office of the Administrator and Office of Communications. | emails of one employee of the ASPA (Marquis Decl. ¶ 14), and four employees of the CMS Office of Communications (Gilmore Decl. ¶ 10). HHS re-used a prior similar search of one employee in the CMS Office of the Administrator. (Gilmore Decl. ¶ 11.) |
| 5. HHS released responsive records to Plaintiff on September 8, 2017, December 14, 2017, and December 15, 2017, with certain information withheld pursuant to FOIA exemptions. Plaintiff has received a total of 274 pages of records. | Disputed as characterized. The information was purportedly withheld pursuant to FOIA exemptions," but there is a material question about whether all such withholdings were appropriate. |
| 6. The OS and CMS declarations and *Vaughn* indexes explain the bases for HHS's withholding of information pursuant to Exemption 5. | Disputed as characterized. The OS and CMS declarations and *Vaughn* index explain the Government's *proffered* bases for withholding information |
| 7. HHS reviewed the information withheld from the responsive records to determine whether any reasonably segregable information could be released. | Undisputed. There is, however, a material question as to whether HHS has actually released all reasonably segregable information. |

Date:   New York, NY
        January 23, 2018

Respectfully submitted,
*/s/ David J. Sandler*

David J. Sandler (Bar No. 988900)
David H. Bernstein (Bar No. NY0228)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY  10022
212-909-6000
dsandler@debevoise.com
dhbernstein@debevoise.com

Benjamin L. Berwick (Bar No. MA0004)
THE PROTECT DEMOCRACY PROJECT
10 Ware Street
Cambridge, MA  02138
Ben.Berwick@protectdemocracy.org

*Counsel for Plaintiff*