**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PROTECT DEMOCRACY PROJECT, INC.,

*Plaintiff*,

v.

U.S. DEPARTMENT OF HEALTH &
HUMAN SERVICES,

*Defendant*.

Civil Action No. 17-792 (RDM)

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Protect Democracy Project, Inc. ("Protect Democracy") brings this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, seeking to compel the Department of Health and Human Services to release records related to the discontinuation of advertising for healthcare.gov, the federal health insurance marketplace, during the final weeks of the 2016–2017 open enrollment period. The case is now before the Court on the parties' renewed cross-motions for summary judgment. *See* Dkt. 43; Dkt. 45.

The sole remaining issue is whether the Department lawfully redacted portions of 13 records pursuant to the deliberative process privilege and FOIA Exemption 5. For the reasons explained below, the Court concludes that the Department has met its burden with respect to one of these records but that *in camera* review is necessary for the remaining 12. Accordingly, the Court will **GRANT** in part and **DENY** in part, without prejudice, the Department's motion for summary judgment; **DENY** without prejudice Protect Democracy's cross-motion for summary judgment; and **ORDER** the Department to provide the Court with unredacted copies of the 12 documents identified below for *ex parte*, *in camera* review.

# I. BACKGROUND

On February 15, 2017, Protect Democracy submitted a FOIA request to the Department seeking the following records:

(1)     Documents between and among employees of the Department of Health and Human Services ("HHS") and/or the Centers for Medicare and Medicaid Services ("CMS") "concerning the decision to discontinue advertising for healthcare.gov and/or enrollment in healthcare coverage;"

(2)     Documents between the HHS and/or CMS transition teams and the White House concerning the same;

(3)     Documents between and among employees of HHS and/or CMS "concerning the effect of the Trump Administration's decision to discontinue the advertising detailed above on enrollment numbers;"

(4)     Documents between and among employees of the HHS Office of Public Affairs and/or CMS Offices of Communications "concerning the article published by *Politico* on January 26, 2017 entitled, 'Trump White House Abruptly Halts Obamacare Ads;'"

(5)     Documents between and among employees of HHS and/or CMS "concerning the number of people who enrolled in healthcare coverage after President Trump took office;" and

(6)     Documents between HHS and/or CMS employees and the White House concerning the same.

Dkt. 1 at 2–3 (Compl. ¶ 5).  When the Department did not timely respond, *see* 5 U.S.C. § 552(a)(6)(A)(i), Protect Democracy commenced this action, *see* Dkt. 1 (Compl.).

The Department eventually conducted a search for responsive records and released 274 pages of records to Protect Democracy, redacting certain portions under FOIA Exemption 5. Dkt. 18-1 at 7.  On December 15, 2017, the Department moved for summary judgment, Dkt. 18, and on January 23, 2018, Protect Democracy filed a cross-motion for summary judgment, Dkt. 20.  In its cross-motion, Protect Democracy argued that (1) the Department did not conduct an adequate search, and (2) the Department unlawfully redacted numerous records pursuant to FOIA Exemption 5.  *Id.* at 15.

The parties significantly narrowed the scope of their dispute over the course of briefing. After reviewing Protect Democracy's opposition and cross-motion, the Department requested an extension of time to file its final brief so that it could conduct further searches for responsive records, Dkt. 22, and the Court granted that request, Minute Order (Feb. 21, 2018).  The Department then conducted supplemental searches and released an additional 256 pages of responsive records.  Dkt. 27 at 12.  The Department also reconsidered some of its prior withholdings and released unredacted copies of a handful of documents.  *Id.* at 4.  These releases had the effect of narrowing the parties' dispute to whether certain records fell within the attorney-client privilege or deliberative process privilege, as the Department claimed.  *Id.*

In a Memorandum Opinion and Order, the Court granted summary judgment in favor of the Department with respect to its attorney-client privilege withholdings but concluded that the Department's *Vaughn* indices had not provided the Court with sufficient detail about the deliberative process privilege withholdings to assess whether they were proper, and so the Court denied summary judgment as to those withholdings.  *Protect Democracy, Inc. v. HHS*, 370 F. Supp. 3d 159, 169 (D.D.C. 2019) ("*Protect Democracy I*").  The Court also granted in part and denied in part Protect Democracy's cross-motion for summary judgment.  *Id.* at 171–72.  The Court explained that the same lack of detail that prevented the Court from "evaluat[ing] whether the redactions were lawful" also left the Court unable to conclude that "Exemption 5 [was] inapplicable or that the redacted material [was] not deliberative."  *Id.* at 171.  With one exception, the Court also denied Protect Democracy's request that the Court conduct an *in camera* review of the disputed records and, instead, ordered the Department to supplement its *Vaughn* indices and/or declarations to better explain the bases for its withholdings.  *Id.* at 169,

172.  The Department subsequently released revised versions of 12 records, with narrower redactions.  *See* Dkt. 44 at 8.

On October 9, 2020, the Department renewed its motion for summary judgment, Dkt. 43, and, along with that motion, filed a supplemental *Vaughn* index providing additional detail concerning the withheld documents.  Dkt. 43-3.  Protect Democracy, in turn, filed a renewed cross-motion for summary judgment on October 29, 2021.  Initially, Protect Democracy identified 23 records in which it believed the Department had unlawfully redacted responsive information.  Over the course of briefing, the parties have since narrowed the scope of their disagreement to redactions in 13 records.

## II.  LEGAL STANDARD

The Freedom of Information Act supports a fundamental pillar of free societies: transparency in government.  FOIA is premised on the notion that "an informed citizenry [is] vital to the functioning of a democratic society" and necessary to "check against corruption and hold the govern[ment] accountable."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  The "general philosophy" of FOIA is "full agency disclosure."  *U.S. Dep't of Def. v. Fed. Labor Rels. Auth.*, 510 U.S. 487, 494 (1994) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360 (1976)).  Upon receiving a FOIA request, an agency must disclose all responsive records to the requestor unless those records fall within one of nine statutory exemptions.  *Id.*; *see* 5 U.S.C. § 552(b).  "These exemptions are 'explicitly made exclusive' and must be 'narrowly construed.'"  *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973); and then quoting *FBI v. Abramson*, 456 U.S. 615, 630 (1982)).

The agency bears the burden of showing that a claimed exemption applies.  *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979); *Loving v. Dep't of Def.*,

550 F.3d 32, 37 (D.C. Cir. 2008).  But merely identifying an exemption that covers some material found in a record does not permit an agency to withhold the record in its entirety. Rather, the agency must "take reasonable steps necessary to segregate and release nonexempt information."  5 U.S.C. § 552(a)(8)(A)(ii)(II).

FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56.  *See Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175 (D.D.C. 2011).  To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that she is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In FOIA cases, an agency can meet this burden by submitting "relatively detailed and non-conclusory" affidavits or declarations, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and an index of the information withheld, *Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973).  The Court may grant summary judgment solely on the basis of information provided by an agency in declarations when those declarations (1) describe "the documents and the justifications for nondisclosure with reasonably specific detail," (2) "demonstrate that the information withheld logically falls within the claimed exception," and (3) "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *see also Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994).

If "agency affidavits in support of a claim of exemption are insufficiently detailed," however, "[s]ummary judgment may not be appropriate without *in camera* review."  *Armstrong v. Exec. Office of President*, 97 F.3d 575, 578 (D.C. Cir. 1996).  In such a circumstance, "district court judges [have] broad discretion in determining whether *in camera* review is appropriate."

*Id.*; *see, e.g.*, *Elec. Priv. Info. Ctr. v. DOJ*, 442 F. Supp. 3d 37, 52 (D.D.C. 2020); *Int'l Counsel Bureau v. U.S. Dep't of Def.*, 864 F. Supp. 2d 101, 105, 110 (D.D.C. 2012).

The Court reviews an agency's decision to withhold records *de novo*. *See* 5 U.S.C. § 552(a)(4)(B).

### III.  ANALYSIS

The remaining issue in this case is whether the Department lawfully redacted information in 13 records pursuant to FOIA Exemption 5:  Documents 2a, 2b, 4, 5, 6, 7, 11, 15, 17a, 19, 20, 21, and 23.  Because Protect Democracy has now withdrawn its challenges to Documents 1, 8, 9, and 14, and to Document 17a's redaction of an email address (but not the remaining redactions to Document 17a), Dkt. 49 at 1 n.1, the Court will dismiss as moot Protect Democracy's claims regarding Documents 1, 8, 9, and 14, and the redaction of the email address from Document 17a.

The Department relies on the deliberative process privilege to justify its redactions in the 13 disputed records.  *See* Dkt. 43; Dkt. 46.  The deliberative process privilege, as embodied in FOIA Exemption 5, protects "documents 'reflecting advisory opinions, recommendations[,] and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)).  The "privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (citation omitted) (quoting *Sears, Roebuck & Co.*, 421 U.S. at 151).

"To qualify for withholding under Exemption 5's [deliberative process] privilege, information must be both 'predecisional' and 'deliberative.'" *Petrol. Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992); *see also Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014); *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006). A record "is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made," and it is "deliberative if it 'reflects the give-and-take of the consultative process.'" *Petrol. Info. Corp.*, 976 F.2d at 1434 (first quoting *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975); and then quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). As with other FOIA exemptions, the agency bears the burden of showing that it has properly invoked the privilege. *See, e.g.*, *Prop. of People, Inc. v. OMB*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018).

To meet this burden, the agency must offer "a relatively detailed justification" for asserting the privilege. *Elec. Privacy Info. Ctr. v. DEA*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)). The agency "cannot justify its withholding on the basis of summary statements that merely reiterate legal standards or offer 'far-ranging category definitions for information.'" *Citizens for Responsibility & Ethics in Wash. v. DOJ*, 955 F. Supp. 2d 4, 13 (D.D.C. 2013) (quoting *King v. DOJ*, 830 F.2d 210, 221 (D.C. Cir. 1987)). When the deliberative process privilege is at issue, the "need to describe each withheld document . . . is particularly acute" because the privilege "is so dependent upon the individual document and the role it plays in the administrative process." *Animal Legal Def. Fund, Inc. v. U.S. Dep't of Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) (quoting *Coastal States Gas Corp.*, 617 F.2d at 867). Thus, when asserting exemptions under the deliberative process privilege, an agency "must provide in its declaration and *Vaughn* index precisely tailored

explanations for each withheld record at issue." *Nat'l Sec. Couns. v. CIA*, 960 F. Supp. 2d 101, 188 (D.D.C. 2013). At the very least, an agency must provide the following information for each document at issue: "(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient." *Id.* at 189 (citing *Senate of P.R. v. DOJ*, 823 F.2d 574, 585–86 (D.C. Cir. 1987); *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257–58 (D.C. Cir. 1982); and *Coastal States Gas Corp.*, 617 F.2d at 867–68)).

In its renewed cross-motion and opposition, Protect Democracy does not maintain that all the Department's redactions to the 13 records at issue are unlawful. Dkt. 49 at 2. Instead, its argument is a narrower one: in Protect Democracy's view, the *Vaughn* index and the unredacted potions of the 13 records suggest that some of the withheld material includes "segregable factual and post-decisional material that HHS must disclose." *Id.* The redactions Protect Democracy disputes fall largely into three categories: (1) records that appear to contain factual information about outreach activities that had been planned by the Obama Administration; (2) internal clarifications and interpretations of final agency decisions; and (3) a sample talking point and certain "background information" that a Department official provided to a White House staffer.

As Protect Democracy stresses, FOIA imposes an obligation on the agency to engage in reasonable efforts to "segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii)(II). To be sure, the Department's renewed motion for summary judgment provides greater detail than it offered in its original motion, which the Court concluded was insufficient, *see Protect Democracy I*, 370 F. Supp. 3d at 169–173, and the Department's declarants attest that they "conducted a line-by-line review" of the documents and "[a]ll reasonably segregable information, nonexempt information . . . has been disclosed," *see* Dkt. 43-

1 at 3 (Decl. of Brandon Gaylord ¶ 8); Dkt. 43-2 at 3 (Suppl. Decl. of Hugh Gilmore at ¶ 8).

But, the Court need not blindly accept an agency's conclusory assurance that it has taken

reasonable steps to segregate information if the record suggests otherwise or the *Vaughn* index

and declarations are not sufficiently detailed to permit the Court to meaningfully assess whether

further segregability is possible. *See Democracy Forward Found. v. Ctrs. for Medicare &

Medicaid Servs.*, No. 18-cv-635, 2019 WL 6344935, at *4–5 (D.D.C. Nov. 27, 2019).  Instead,

the Court must consider whether the Department has offered sufficiently detailed declarations

and *Vaughn* indices, *see Johnson v. Exec. Off. for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir.

2002), which will—along with the portions of the records that the Department has not

redacted—permit the Court to engage in the type of meaningful, *de novo* review required under

FOIA.

  With this background in mind, the Court will, in turn, address each of the three categories

of redactions that Protect Democracy contests.[1]

## A. Factual Information About Prior Administration Plans: Documents 2a, 2b, 4, 7, 11, 15, 19, 20, 21

  Protect Democracy first argues that the Department unlawfully redacted nondeliberative

factual material from nine documents.  *See* Dkt. 43-4 at 5–6 (Doc. 2a), *id.* at 8–9 (Doc. 2b); *id.* at

14–20 (Doc. 4); *id.* at 27–28 (Doc. 7); *id.* at 37–38 (Doc. 11); *id.* at 49–51 (Doc. 15); *id.* at 61

(Doc. 19); *id.* at 63 (Doc. 20); *id.* at 65–66 (Doc. 21).  The common question for each of these

documents is whether factual information (*e.g.*, schedules, financial information, contract terms)

---

[1] Because the parties initially disputed 23 documents in their renewed motions for summary
judgment, the Department's renewed summary judgment motion assigned each document a
number ranging from 1 to 23.  *See* Dkt. 43-3 (*Vaughn* index); Dkt. 43-4 (Exhibits).  Although the
parties have since narrowed their dispute to 13 records, to avoid confusion, the Court will
continue to reference each document according to the number it is assigned in the *Vaughn* index.

about outreach activities that had been planned—but not executed—by the Obama

administration, and then later became subject to reconsideration by the Trump administration,

falls within the deliberative process privilege.  Protect Democracy offers two reasons why, in its

view, the answer is no.  First, it argues that any information concerning the Obama

administration's planned outreach activities was post-decisional, because those activities

represented the "final decisions" of that administration.  In Protect Democracy's view, "final

decisions made by the previous Administration cannot retroactively be characterized as

deliberative merely by virtue of the current Administration's desire to revisit them."  Dkt. 44 at

14.  Second, it argues that the information for which it seeks disclosure is factual in nature, not

deliberative; that is, it is a *fact* that the Obama administration planned certain outreach activities,

and it is a *fact* that those activities, for instance, had been planned for certain dates, cost a certain

amount of money, and involved contracts with certain terms.  *Id.* at 14–15; Dkt. 49 at 4.

Although Protect Democracy acknowledges that opinions and deliberations are privileged if they

concerned whether to reconsider certain outreach activities, it insists that the underlying facts

about the Obama administration's outreach plan for the 2016–2017 Open Enrollment period are,

by their nature, nondeliberative and therefore segregable.

Unsurprisingly, the Department takes a different view.  It argues that the factual material

at issue is privileged because it "provides the 'foundation' for the agency's 'discussion' of its

options" and so would reveal the "substance and structure of protected agency deliberations."

Dkt. 43 at 11–12.  The Department invokes *Ancient Coin Collectors Guild v. U.S. Dep't of State*,

641 F.3d 504 (D.C. Cir. 2011), for the proposition that the "legitimacy of withholding does not

turn on whether the material is purely factual in nature . . . , but rather on whether the selection or

organization of facts is part of the agency's deliberative process" or involves an "exercise in

judgment." *Id.* at 513 (citing *Montrose Chemical Corp. of Cal. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974)).  Under this principle, the Department insists, the factual information at issue was properly withheld because its "disclosure would 'permit[] inquiry into the mental processes' by which the agency arrived at its decision" during the Trump administration.  *Id.* at 12 (quoting *Playboy Enters., Inc. v. DOJ*, 677 F.2d 931, 936 (D.C. Cir. 1982)).

Protect Democracy, in turn, counters that the information at issue more closely resembles the factual material in *Playboy Enterprises, Inc. v. DOJ*, 677 F.2d 931.  That case concerned a FOIA request seeking to compel disclosure of factual material contained in a report prepared by the Justice Department's Office of Professional Responsibility ("OPR").  The Justice Department argued that the facts at issue fell within the deliberative process privilege because they reflected the "choice, weighing and analysis of facts" of the report authors.  *Id.* at 935.  The D.C. Circuit disagreed and upheld the district court's conclusion, reached after *in camera* review, that the facts contained in the OPR report were nondeliberative and therefore severable from the report's opinions and recommendations.  *Id.*  It explained that "a report does not become part of the 'deliberative process' . . . merely because it contains only those facts which the person making the report thinks material;" instead, the "deliberative process privilege . . . is dependent upon the individual document and the role it plays in the administrative process."  *Id.*  The D.C. Circuit distinguished the factual material in *Playboy Enterprises* from the summaries at issue in *Montrose Chemical*, 491 F.2d 63, a decision that reached the opposite conclusion and that the D.C. Circuit subsequently relied upon in *Ancient Coin Collectors Guild*, 654 F.3d at 513.  The difference in *Montrose Chemical*, the *Playboy Enterprises* court explained, was that the factual summaries there were distillations of a voluminous record and were "prepared for the sole purpose of assisting the [EPA] Administrator to make a complex decision in an adjudicatory

proceeding." *Playboy Enters.*, 677 F.2d at 936.  In that context, requiring "disclosure of the summaries would [have] result[ed] in publication of the evaluation and analysis of the multitudinous facts made by the Administrator's aides and in turn studied by him in making his decision." *Id.*  Probing the factual summaries, in that context, "would be the same as probing the decision-making process itself." *Id.*

The Court need not pause long over Protect Democracy's first argument—that "[t]he final decisions made by the [Obama] Administration cannot retroactively be characterized as deliberative merely by virtue of the [Trump] Administration's desire to revisit them," Dkt. 44 at 14.  The Department's reply brief is categorical in describing the limited scope and nature of its reliance on the deliberative process privilege to withhold information relating to the Obama administration's planned outreach: "To be clear, the Department's argument is not that decisions made by the [Obama] Administration remained inherently deliberative until they took effect. . . . Rather, the Department's argument is that factual material about those earlier decisions may be exempt from disclosure under Exemption 5 for all of the usual reasons," including "because it is contained in a draft document-in-progress, or is inextricably intertwined with analysis and opinion, or has been selected in a way that would reveal the subjects of protected deliberations." Dkt. 46 at 2.  To this, the Department adds: "All of the material withheld on these bases was written by the [Trump] Administration to inform its own decision-making processes." *Id.* Because the Department's invocation of Exemption 5 is not premised on a claim that the Obama administration's once-final deliberations regarding an outreach plan "retroactively" became "deliberative" when the Trump administration decided to revisit that plan, Protect Democracy's first argument is non-responsive.

Protect Democracy's second argument, however, is both responsive and more convincing. The parties' dispute over the redacted factual material resides at the intersection of two conflicting principles. On the one hand, "[f]actual material that does not reveal the deliberative process is not protected." *Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983)). But, on the other hand, information that is "purely factual in nature" can, nonetheless, reveal internal agency deliberations if it "reflects an 'exercise of discretion and judgment calls.'" *Ancient Coin Collectors Guild*, 641 F.3d at 513 (quoting *Mapother v. DOJ*, 3 F.3d 1533, 1539 (D.C. Cir. 1993)). The "selection or organization of facts" can reveal internal agency deliberations, for example, when factual material is "culled from a much larger universe of facts" and "assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action." *Id.* (quoting *Mapother*, 3 F.3d at 1539). The essential question for the Court is whether segregating and requiring the release of certain factual information will "expose [the] agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman Commc'ns v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987); *see also Ancient Coin Collectors Guild*, 641 F.3d at 513.

Applying these principles in this context requires a detailed, document-by-document assessment, informed by the Department's declarations and *Vaughn* index and by the snippets of materials left unredacted in the documents at issue. To the extent the available information is "[in]sufficiently detailed" to assess the agency's "claims of exemption," *in camera* inspection may be appropriate. *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 997 (D.C. Cir. 1998); *see, e.g.*,

*Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. U.S. Dep't of Labor*, 828 F. Supp. 2d
183, 190–91 (D.D.C. 2011) (conducting *in camera* review of a meeting agenda and only
upholding the redaction of agenda items that reflected "deliberations about policy and the
personal opinions of agency staff").

    1.    *Document 11*

Document 11 is a copy of an email chain between Randy Pate, a CMS Special Assistant,
and "counselors of the Secretary [of the Department of Health and Human Services] and the
Chief of Staff." Dkt. 43-3 at 4 (*Vaughn* index). The entirety of Pate's email is redacted, except
for the final line, which reads: "Thanks for hearing me out on this, I'm about to join the call
now." Dkt. 43-4 at 37–38. One of the recipients of the email replies to Pate's email with the
following: "Hi Randy, I just talked to Tim. Here is the update: They can move forward with the
blast e-mails and other free social media outreach content. A portion (but not all) of the ad
funding has been pulled back." Dkt. 43-4 at 37.

Based solely on that reply, Protect Democracy argues that Document 11's "expansive
redaction . . . appears to withhold information regarding the Obama Administration's planned
'blast emails, free social media outreach content' and 'ad funding'" that can be segregated and
released. Dkt 49 at 6. The Court is unpersuaded. Although the reply to Pate's email suggests
that the topic of the email related to blast emails, free social media outreach content, and ad
funding, that is all that it suggests. By contrast, the Department's *Vaughn* index explains that the
content of Pate's email is entirely deliberative:

> Withheld material consists of a CMS Special Assistant's opinions . . . on which
> direction the agency should choose for the ad buys/outreach for open enrollment.
> Randy Pate provides higher-level officials with his views on a range of related
> issues, summarizes deliberative conversations with other agency officials, and
> suggests courses of action.

Dkt. 43-3 at 4 (*Vaughn* index).  This description, which is proffered under the penalty of perjury, *see* Dkt. 43-1 at 2 (Gaylord Decl. ¶ 4), is unambiguous and leaves no doubt that any factual content is incidental to, and inextricably intertwined with, "recommendations" made "by an agency employee" regarding "which options he [thought] should be pursued."  *Id.*  Material of that type lies at the core of the deliberative process privilege, and nothing that Protect Democracy argues suggests otherwise.  *See Ancient Coin Collectors Guild*, 641 F.3d at 513.

The Court will, accordingly, grant the Department's motion for summary judgment and deny Protect Democracy's cross-motion for summary judgment with respect to Document 11.

2.       *Documents 2a, 2b, 4, 7, 15*

The withheld material in Documents 2a, 2b, 4, 7, and 15 consists of "summar[ies] and discussion[s] of the financial implications of certain options regarding outreach activities."  Dkt. 43-3 at 2, 5 (*Vaughn* index); *see also id.* at 3.  In Document 7, an email with the subject line "Financial Implications of Pulling Advertising," a "lower level" CMS employee, Laura Salerno, sends a "draft of the summary of possible outreach discontinuation activities and their financial implications" to Mary Wallace, the Acting Director for the CMS Office of Communications. Dkt. 43-3 at 3 (*Vaughn* index).  The text of the email begins, "Mary – here are the numbers," followed by more than a page of redacted text.  Dkt. 43-4 at 27–28.  Document 4 reflects that, shortly after receiving the summary, Wallace circulated it (or a version of it) to senior Department officials.  Dkt. 43-4 at 16; *see also* Dkt. 43-3 at 3 (*Vaughn* index) (noting that the Salerno email contained "an earlier draft of the summary of possible outreach discontinuation activities and their financial implications withheld from Documents 2.a, 2.b, and 4").  Referencing the summary, Wallace tells the officials, "Since I just got this – here is the info that I plan to share back.  Let me know any concerns/questions."  Dkt. 43-4 at 16.  The Department

also redacted from Document 4 "comments and suggestions from others" regarding what "information to include in the draft summary."  Dkt. 43-3 at 3 (*Vaughn* index).  Then, in Documents 2b (of which Document 2a is a partial copy) and 15, Wallace sends a revised version of the summary to Mark Weber, the Deputy Assistant Secretary for Public Affairs/Human Services, who passes it along to other Department officials "[p]er request."  Dkt. 43-4 at 8.

Protect Democracy seizes upon Document 7's mention of "numbers" to argue that the financial summary initially created by Salerno and later circulated by Wallace contains "non-deliberative data and factual information regarding 'numbers' that [can] be segregated and disclosed."  Dkt. 44 at 16.  Protect Democracy argues that "the financial implications of cancelling the Obama Administration's final advertising decisions were predetermined at the time those decisions were made, and thus the data reflects a rote calculation of financial consequences, rather than an 'exercise of judgment.'"  Dkt. 49 at 5.  For support, it points to *Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, which held that "survey results" and "final survey data" were not protected by the deliberative process privilege, 243 F. Supp. 3d 155, 171–73, 175–76 (D.D.C. 2017), and *Democracy Forward Foundation*, which held that, because CMS open-enrollment "data analytics and analysis" are factual in nature, they are not exempt unless CMS can demonstrate that the data was not segregable from otherwise exempt material, 2019 WL 6344935, at *4–5.

The Department offers two responses.  First, it maintains that the information in at least some of these documents is in draft form, and drafts are quintessentially pre-decisional and deliberative.  Dkt. 46 at 2 (citing *In re Apollo Grp., Inc. Sec. Litig.*, 251 F.R.D. 12, 31 (D.D.C. 2008)).  Second, the Department argues that the redacted summary is exempt from disclosure because the "selection or organization of facts" would reveal "an agency's deliberative process."

16

Dkt. 46 at 3 (quoting *Ancient Coin Collectors Guild*, 641 F.3d at 513). Notably, the Department does not argue—as it does for other documents—that the factual material in this set of emails is "inextricably intertwined" with deliberative material.

As a preliminary matter, the Department is not entitled to prevail merely because certain versions of the financial summary were "drafts." True, draft documents are "typically considered deliberative." *Hardy*, 243 F. Supp. 3d at 173 (citing *Coastal States Gas Corp.*, 617 F.2d at 866). But an agency "cannot withhold" factual material "merely by stating that it is in a draft document," *Dudman Commc'ns Corp.*, 815 F.2d at 1569, and decisions in this Circuit have repeatedly held that "raw facts with informational value in their own rights" are not exempt from FOIA, even if they are included in a draft document, *BuzzFeed, Inc. v. DOJ*, 419 F. Supp. 3d 69, 78 (D.D.C. 2019); *accord Hardy*, 243 F. Supp. 3d at 174.

That brings the Court to the heart of the parties' disagreement. Some of the redacted material in this set of documents—particularly redactions in Document 4—withholds agency officials' deliberations regarding "the language of the draft summary," Dkt. 43-3 at 3 (*Vaughn* index). That material, which reflects pre-decisional "opinions, recommendations[,] and deliberations," *Sears, Roebuck & Co.*, 421 U.S. at 150, was properly withheld. Those redactions, however, are not the focus of Protect Democracy's challenge. Instead, Protect Democracy presses for disclosure of the financial data that formed the basis of the participants' deliberations, which are factual in nature. *See Democracy Forward Found.*, 2019 WL 6344935, at *4–5. The question for the Court to decide with respect to this category of documents, then, is whether the selection of information included in the financial summary or the organization or presentation of that information would reveal the Department's deliberative process.

On the present record, the Court cannot answer that question.  Although the relevant entries in the Department's *Vaughn* index are an improvement over the last round of briefing, they still lack sufficient detail to permit meaningful judicial review.  In relevant respects, they merely tell the Court that the redacted material "consists of a summary . . . of the financial implications of certain options regarding outreach activities," Dkt. 43-3 at 2, 5 (*Vaughn* index), or "an earlier draft of the summary of possible outreach discontinuation activities and their financial implications," *id.* at 3.  The documents themselves, moreover, at least suggest that the redacted information is factual in nature.  Documents 2a, 2b, and 15, for example, refer to the redacted material as "the rest of the information you asked for," Dkt. 43-4 at 5, 8, 49; Document 4 refers to it as "the info that I plan to share back," *id.* at 16; and Document 7 says, "here are the numbers," *id.* at 27.

As explained above, factual summaries are, at times, entitled to protection under Exemption 5.  But "[p]urely factual material usually cannot be withheld . . . unless it reflects an 'exercise of discretion and judgment calls.'"  *Ancient Coin Collectors Guild*, 641 F.3d at 513 (quoting *Mapother*, 3 F.3d at 1539).  Factual summaries that are "culled . . . from [a] much larger universe of facts," for example, may "reflect an 'exercise of judgment as to what issues are most relevant to the pre-decisional" deliberations.  *Id.*  Similarly, the "selection or organization of facts" included in a summary may reveal internal, agency deliberations.  *Id.*  And, at times, even the question posed, which can be inferred from the facts offered in response, may disclose protected deliberations.

The problem here is that the Court cannot discern whether the factual material included in the summaries is likely to reveal anything about the Department's pre-decisional deliberations regarding the termination of planned outreach activities.  If the summaries, for example, list

every then-existing contract for planned outreach activities, the Court might conclude that they do not "reflect[] an 'exercise of discretion [or] judgment calls,'" *id.*, and that they, at most, reveal a fact that the Department does not dispute—that the Trump administration sought to terminate at least some planned outreach activity. But, on the other hand, if the summaries highlight those outreach activities that the agency staff had selected for possible termination based on policy priorities or other, similar factors, disclosure would likely reveal protected recommendations made by staff and less senior agency officials to the decisionmakers.

When an "agency [has] fail[ed] to provide a sufficiently detailed explanation to enable the . . . court to make a de novo determination of the agency's claims of exemption, the . . . court . . . has several options, including inspecting the documents *in camera*, requesting further affidavits, or allowing the plaintiff discovery." *Spirko*, 147 F.3d at 997; *see also* 5 U.S.C. § 552(a)(4)(B) (granting district courts discretion to conduct *in camera* review to determine whether a record "shall be withheld" in whole or in part). Here, because the documents at issue are "relatively short in length," *Dillon v. DOJ*, No. 17-1716, 2019 WL 249580, at *8 (D.D.C. Jan. 17, 2019), and few in number, and because the Court has already provided the Department with an opportunity (to no avail) to supplement its declarations and *Vaughn* index, *Protect Democracy I*, 370 F. Supp. 3d at 172, the Court will now order that the Department submit unredacted copies of Documents 2a, 2b, 4, 7 and 15 to the Court for *ex parte*, in camera review.

4.    *Documents 19, 20, 21*

Document 20 is a portion of an email from Tasha Bradley to Department officials, including Mark Weber. Dkt. 43-4 at 63. The body of the email begins: "Below please find a list of Open Enrollment activities planned for the next two weeks. This doesn't include any social media, email marketing, ads, etc. We will discuss pulling together a more robust list of items

tomorrow during our meeting with CMS." *Id.*  The remainder of the email, which appears to

contain a large block of text, is redacted.  *Id.*  Document 19 is a copy of this same email, which

Weber forwarded to others at the Department.  Dkt. 43-4 at 61.  In forwarding the email, he

wrote: "FYI – foundation for our discussion with CMS public affairs staff at 10 am on Open

Enrollment."  *Id.*  Document 21 includes two additional emails in the same chain, reflecting

further discussions between the Deputy Director of the Office of Intergovernmental and External

Affairs, the Principal Deputy Assistant Secretary for Public Affairs, and a Special Assistant.

Dkt. 43-4 at 65.  A significant portion of both emails is also redacted.  *Id.*  The bottom of

Document 21 includes the original email from Weber (Document 19) and the original email from

Bradley (Document 20).  *Id.* at 65–66.  With respect to all three documents, the *Vaughn* index

explains that the "[w]ithheld materials consist of planned outreach activities from the prior

administration that the new administration was in the process of reviewing and determining

whether to pursue or discontinue."  Dkt. 43-3 at 6 (*Vaughn* index).

Protect Democracy argues that the list of planned open enrollment activities included in

each of these three documents lies beyond the reach of Exemption 3 because it is "a

comprehensive list of data—brute facts, not an analysis—relating to final decisions made by the

Obama Administration."  Dkt. 49 at 3.  The Department acknowledges that the list of planned

activities is factual in nature, but it insists that the information should be redacted nonetheless

because it provided the "'foundation' for the agency's deliberative 'discussion.'"  Dkt. 46 at 4.

As a preliminary matter, the Court does not understand Protect Democracy to dispute the

redactions of the two emails that are unique to Document 21, which appear to be predominantly,

if not purely, deliberative in nature.  *See* Dkt. 43-4 at 65.  Those emails contain unredacted text

that is typical of deliberative material: "my initial reaction is that HHS/CMS;" "I'd recommend;"

"A second question is;" and "I think we [should] talk more about that among ourselves." *Id.* Instead, the Court understands Protect Democracy's challenge to focus on the same list of open enrollment activities that is included in all three documents.

As with Documents 2a, 2b, 4, 7, and 15, the Court cannot discern from the existing record whether the admittedly factual material contained in Documents 19, 20, and 21—a list of "planned outreach activities from the [Obama] administration," Dkt. 43-3 at 6 (*Vaughn* index)— is purely deliberative or not readily segregable.  Once again, it is possible that the compilation of the list "reflects an 'exercise of discretion and judgment calls," or a process of "selection or organization" that was "part of [the] agency's deliberative process."  *Ancient Coin Collectors Guild*, 641 F.3d at 513.  But the introductory clause suggests otherwise, merely characterizing the redacted material as "a list of Open Enrollment activities planned for the next two weeks," excluding "social media, email marketing, ads, etc."  Dkt. 43-4 at 63.  In any event, the Court certainly cannot conclude that the list is itself deliberative based on the sparse description contained in the *Vaughn* index.  Nor is the Court persuaded, at least on the present record, by the Department's equally unilluminating contention that the list is protected under Exemption 5 because it formed "the 'foundation' for the agency's 'discussion' of its options."  Dkt. 43 at 11; *see also* Dkt. 46 at 4–5.  Data on the number of automobile deaths occurring in the United States might form the "foundation" for agency deliberations about enhanced safety requirements to include in a proposed rule.  But the unfiltered data, standing alone, would reveal nothing about those deliberations.  Beyond what is already known—that is, that a debate occurred—the same is at least arguably true here.  And, finally, none of the available information concerning Documents 19, 20, and 21 suggests that the redacted list of open enrollment activities is

"inextricably intertwined" with deliberative content—to the contrary, the list appears to stand alone, even if it was then used in subsequent deliberations.

For these reasons, the Court is skeptical that the redacted list of planned Open Enrollment activities is protected by Exemption 5.  But because the Court will already conduct an *in camera* inspection of Documents 2a, 2b, 4, 7, and 15, and because adding a single, further paragraph to that inspection will neither materially increase the burden on judicial resources nor hinder the prompt resolution of this case, the Court will order the Department to submit unredacted copies of Documents 19, 20, and 21 to the Court for *ex parte*, *in camera* review.

## B.      Internal Clarifications of Final Agency Decisions: Documents 5, 6, and 23

The second category of redactions that Protect Democracy challenges consists of emails in which agency officials sought to clarify or interpret the administration's final decision canceling select healthcare.gov advertisements.  *See* Dkt. 43-4 at 22–23 (Doc. 5); *id.* at 25 (Doc. 6); *id.* at 70–72 (Doc. 23).

First, Document 5 is comprised of two emails sent by Mary Wallace to senior officials of CMS and the Department.  Dkt. 43-4 at 22–23.  According to the Department's *Vaughn* index, "[t]he withheld material consists of requests for clarification on what discontinuation activities should be pursued if certain criteria are met.  These emails are part of a deliberation over planned, but not yet final, actions regarding outreach activities."  Dkt. 43-3 at 3 (*Vaughn* index). In the unredacted portions of the email, Wallace tells one senior official that she "ha[s] two questions based on [his] note."  Dkt. 43-4 at 23.  The questions that follow are redacted.  *Id.* Wallace then asks the broader group on the email chain: "Can we get confirmation from everyone on here of what you want us to do.  I just want to be really clear."  *Id.*  Significantly, the Department has left unredacted the portion of the email chain that sets forth the final agency

decision.  After posing her questions, at 8:45 p.m. on January 26, 2017, Mary Wallace writes at

10:16 p.m. that same night: "Just to close the loop, based on our call we will move forward with

the low cost tactics (emails, social and autodials) and focus on pulling back ads if we can get

savings primarily, but if for certain things we can't—then we will let them run."  *Id.* at 22.

Second, Document 6 is a copy of an email chain between Mary Wallace and Patrick

Conway, the Acting CMS Administrator.  Dkt. 43-4 at 25.  Wallace's email is redacted except

for the last line, in which she writes: "Let me know if anyone wants to discuss."  *Id.*  Conway's

reply begins, "To confirm," and the rest of his email is then redacted.  *Id.*  The Department's

*Vaughn* index attests that the withheld material consists of a request from Wallace for

"clarification on what discontinuation activities should be pursued if certain criteria are met" and

Wallace's and Conway's "interpretations of the instructions given."  Dkt. 43-3 at 3 (*Vaughn*

index).

Finally, Document 23 consists of an email chain between Wallace and senior CMS

officials, which includes the same (redacted) email in which Wallace poses her two questions,

and a later email from Karen Jackson, the Acting Chief Operating Officer of CMS, which is

redacted in its entirety.  Dkt. 43-4 at 70–72.  According to the *Vaughn* index, the Department has

redacted portions of Wallace's emails in which she requests "clarification on what

discontinuation activities should be pursued if certain criteria are met and provid[es] her

interpretations of the instructions given for comment by senior officials."  Dkt. 43-3 at 7

(*Vaughn* index).

Protect Democracy argues that the redacted material in these emails should be released

because the exchanges occurred "after the decision [to cancel certain advertisements] was made

and the Trump administration 'settled upon' a policy on advertisement cancellation."  Dkt. 49 at

6 (quoting *Machado Amadis v. DOJ*, 388 F. Supp. 3d 1, 18 (D.D.C. 2019)).  The Department, in

contrast, takes issue with Protect Democracy's characterization of these conversations as post-

deliberative and, instead, argues that agency officials were still "deliberating over the nature of

the Department's decisions" by "asking questions about [them] and offering tentative

interpretations."  Dkt. 46 at 6.

The redactions to Documents 5, 6 and 23 present a close question.  On the one hand,

"documents interpreting or explaining existing [final] policy do not fall within Exemption 5."

*Gov't Accountability Project v. U.S. Nuclear Regul. Comm'n*, No. 86–1976, 1993 WL 13033518,

at *2 (D.D.C. July 2, 1993).  It is far from clear, however, whether the emails at issue concern (1)

a final agency policy; (2) a policy on the verge of finalization; or (3) post-decision deliberations

about matters that were not resolved by an earlier, final decision.  In describing Document 5, the

*Vaughn* index asserts that the emails were "part of deliberations over planned, but not yet final,

actions regarding outreach activities."  Dkt. 43-3 at 3 (*Vaughn* index).  Those emails, in turn,

span a period from 8:45 p.m. on January 26, 2017, until 10:16 p.m. that evening, when Wallace

"close[s] the loop" by summarizing the agency's plan to "move forward" with certain cuts to the

outreach program.  Dkt. 43-4 at 22–23.  Document 6 contains redactions from an email exchange

between Wallace, Conway, and others earlier that day, at 10:43 a.m.  *Id.* at 25.  The *Vaughn*

index describes that email as "requesting clarification on what discontinuation activities should

be pursued if certain criteria are met," and then notes that the language from "Wallace's email

also appears in Document 3."  Dkt. 43-3 at 3 (*Vaughn* index).  The index, in turn, provides a

more detailed description of the redacted material with respect to Document 3, noting that the

material is from an email exchange between Wallace, Jackson, and Lisa Watkins, a Senior

Advisor in the Office of the Administrator.  *Id.* at 2.  The entry goes on to explain that "Watkins

[was] requesting more information about which outreach activities the agency [was] planning to cancel and requesting a discussion about those planned cancellations." *Id.* Notably, the *Vaughn* index reports:

> Although some of the questions and responses appear to represent final decisions—*e.g.*, "We are doing X"—they are merely interim understandings and not final decisions. The agency took a somewhat different course than is described here. It is therefore clear that these questions and answers by high-level officials are part of the deliberative process by which the agency reached that different decision.

*Id.*

Although the timeline for these emails suggests that the redacted materials relate to discussions occurring just before a final decision was reached, that inference is too speculative to carry the day, particularly given the Court's need to review other records *in camera*. Three obstacles, in particular, prevent the Court from granting summary judgment for either party at this time. First, the Department's *Vaughn* index does not clarify whether the answers Wallace sought had already been considered and settled upon by the agency or whether they, instead, informed the decision-making process. *See Nat'l Sec. Couns.*, 960 F. Supp. 2d at 189. Second, the *Vaughn* index does not clarify the "nature of the decisionmaking authority vested in the . . . author[s] and recipient[s]" of the redacted material. *Id.* Were the senior officials whose views Wallace solicited, for example, vested with decisionmaking authority over the matters she raised? If so, then their interpretations and clarifications—if final—might themselves constitute or reflect final decisions. *See Petrol. Info. Corp.*, 976 F.2d at 1434 (identifying the key inquiry as whether material was "prepared in order to assist an agency decisionmaker in arriving at [a] decision, rather than to support a decision already made" (quotation marks omitted)). Finally, there is at least some evidence that a final decision of some sort was made before Wallace posed her questions and the related email communications were sent. Indeed, Wallace's email was sent

in response to an email from Randy Pate, Dkt. 43-4 at 71–72, which copied Tim Clark, the White House liaison for the Department, *id.* at 55, stating in unequivocal terms: "The free email blasts, social media etc *are approved to go forward*," and "[t]he ad buys that cannot be refunded at this point *are ok to go*," *id.* at 71 (emphasis added). The fact that Pate copies the White House liaison "to ensure" that Pate has not "missed anything," *id.*, at a minimum suggests that the White House was directly involved and had signed off on at least a portion of the plan. To the extent the redacted portions of Documents 5, 6, and 23 relate to that (partial) final decision—if it was, in fact, final—some doubt may be cast on the Department's invocation of Exemption 5.

The Court will, accordingly, require the Department to submit Documents 5, 6, and 23 to the Court for *ex parte, in camera* review. In addition, because the unredacted documents may themselves fail to reveal the needed context to permit the Court to resolve the cross-motions for summary judgment, the Court will also require the Department to submit a supplemental declaration addressing the questions the Court has raised.

## C.  Talking Points: Document 17a

Finally, Protect Democracy maintains that the Department unlawfully withheld responsive, nondeliberative information in an email from Clark to a White House official ("Katy"). *See* Dkt. 43-4 at 55 (Doc. 17a). The body of the email is fully redacted. *Id.* The corresponding entry of the *Vaughn* index describes the withheld material as "background information" and a "sample talking point to inform WH decisionmaking on how to present the Administration's position on ACA Open Enrollment Ads." Dkt. 43-3 at 5 (*Vaughn* index). According to Protect Democracy, both the "background information" and "talking points" fall beyond the scope of Exemption 5 because they are nondeliberative and post-decisional. Dkt. 49 at 7. First, Protect Democracy argues that the Department has essentially conceded the point by

26

distinguishing in its *Vaughn* index between a "draft of th[e] email," Dkt. 43-3 at 5 (*Vaughn* index), which Protect Democracy no longer seeks, and "the final version," *id*., which it does. Dkt. 49 at 7.  Protect Democracy explains, because "these talking points are final, they are obviously not deliberative."  *Id.*  Second, it argues that, at a minimum, "any factual 'background information' about the Trump administration's final decision to cancel portions of existing ACA outreach commitments [was] post-decisional and should be produced."  *Id.*

The Department sees things differently.  It points out that Protect Democracy's argument that the sample talking point "represents a final decision by the Department simply controverts the representation in the *Vaughn* index that it was a 'sample' prepared 'to inform [White House] decisionmaking on how to present the Administration's position.'"  Dkt. 46 at 6.  The email is protected, in the Department's view, because it "contains the agency's suggestion of what the White House should say."  Dkt 43 at 11; Dkt. 46 at 6–7.

The Department has carried its burden of demonstrating that the sample talking point that Clark provided to the White House is protected under Exemption 5.  The *Vaughn* index explains that it was offered as a "sample . . . to inform" White House "decisionmaking on how to present the Administration's position."  Dkt. 43-3 at 5 (*Vaughn* index).  As such, the talking point was not final; it did not come from decisionmakers but, rather, was offered to decisionmakers to "inform" the "decisionmaking" process.  In short, the talking point was sent to advise the White House on its public messaging.  That is a quintessentially deliberative communication.  *See, e.g.*, *Am. Ctr. for Law & Justice v. DOJ*, 325 F. Supp. 3d 162, 172–74 (D.D.C. 2018).  The fact that Clark sent the "final version" of the email does not mean that the email constituted the Trump administration's final decision on messaging.  To the contrary, much of the advice provided to inform internal, government deliberations comes in the form of an email or memorandum that

was preceded by prior drafts.  An email may become "final"—as opposed to a "draft"—when the author hits send.  But that does not mean that the advice contained in the email becomes the final views of the agency when the author stops editing and sends it to her supervisor or colleagues. For that reason, Protect Democracy's invocation of *Judicial Watch, Inc. v. U.S. Department of State* falls flat: in *Judicial Watch*, the disputed communication at issue "convey[ed] the final result of an earlier discussion about how to respond to a past inquiry."  349 F. Supp. 3d 1, 10 (D.D.C. 2018).  Here, in contrast, the Department represents that the email was merely offered to "inform" White House "decisionmaking."  Dkt. 43-4 at 5 (*Vaughn* index).

The "background information" contained in the email, however, presents a closer question, which the Court cannot resolve on the present record.  The problem is that the email is redacted in its entirety, Dkt. 43-4 at 55, leaving the Court with no clues about the nature of the "background information," and the *Vaughn* index is equally opaque, merely asserting that the email contained "background information," Dkt. 43-3 at 5 (*Vaughn* index).  Without any evidence regarding the nature of the "background information," the Court cannot assess whether it consists of unadorned, publicly available facts; a description of the Department's internal deliberations; Clark's assessment of the political landscape; or information "'culled' . . . from a much larger universe of facts" thereby reflecting Clark's "judgment calls" about the key points to inform the White House's communications strategy.  *Ancient Coin Collectors Guild*, 641 F.3d at 513.

The Court will, accordingly, require the Department to submit Document 17a to the Court for *ex parte, in camera* review.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part, without prejudice, the Department's motion for summary judgment.  Specifically, the Court **GRANTS** the Department's motion for summary judgment with respect to Document 11 but **DENIES** the Department's motion without prejudice with respect to the remaining documents.  The Court further **DENIES** without prejudice Protect Democracy's cross-motion for summary judgment. The Court further **ORDERS** that the Department shall, on or before September 27, 2021, submit unredacted versions of Documents 2a, 2b, 4, 5, 6, 7, 15, 17a, 19, 20, 21, and 23 to the Court for *ex parte*, *in camera* review, as well as a supplemental declaration concerning Documents 5, 6, and 23.  After reviewing these materials, the Court will determine the appropriate next steps for bringing this case to conclusion.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 13, 2021